Syllabus.

[No. 1665.]

## B. F. TEMPLE v. THE STATE.

1. PROOF OF VENUE.—When no proof of the venue of the offense appears in the record, the judgment of conviction must be set aside.

2. DYING DECLARATIONS are received in evidence from the necessity of the the case, for the purpose of identifying the prisoner and the deceased, establishing the circumstances of the *res gestæ*, and proving the transactions which resulted in the homicide; but declarations relating to former and distinct transactions are not admissible.

3. SAME—PRACTICE.—In a trial for murder, the dying declaration of the deceased, which had been reduced to writing, was objected to by the defense, because part of it related to matters which transpired before the difficulty between the deceased and the defendant began. The trial court excluded from the jury so much of the declaration as related to such antecedent matters, and admitted the remainder. *Held*, correct. Note the predicate *held* sufficient to warrant the action of the trial court.

4. JUDICIAL KNOWLEDGE OF MUNICIPAL CORPORATIONS is not legally chargeable to the courts of this State, inasmuch as the general laws enable every city and any town of two hundred inhabitants to incorporate itself by complying with prescribed conditions, of which it would be unreasonable to charge the courts with judicial notice. See the opinion *in extenso* for elucidation of this ruling.

5. PROOF OF CORPORATE EXISTENCE.—If a locality has been incorporated by legislative enactment, the primary evidence thereof is the original charter or incorporative act, or an authenticated copy thereof. But when it is shown that such primary evidence is lost or cannot be had, secondary evidence is competent by proof of long continued user and reputation, or prescription. The sufficiency of such proof is ordinarily for the determination of the jury.

6. SAME.—If the corporation was created by virtue of the provisions of Chapter 11, Title 17 of the Revised Statutes of this State, a certified copy of the county judge's entry on the record of the Commissioners' Court would, it seems, be the primary evidence of the incorporation

7. PROOF OF OFFICIAL CHARACTER.—In a trial for murder, it was in proof that the deceased was killed by the defendant while the former was endeavoring to arrest the latter for unlawfully carrying a pistol, and the State proposed to prove that the deceased, when killed, was the marshal of the incorporated town in which the homicide occurred. *Held*, that, without showing the appointment and qualification of the deceased as the town marshal, his official character could be shown by proof that he was marshal *de facto*, and was recognized as such by the municipal authorities.

8. PROOF OF THE TIME OF THE COMMISSION OF THE OFFENSE.—Neither the State nor the defense is bound by the allegation in the indictment of the

date of the offense; and, to warrant a conviction for an offense liable to be barred by limitation, the proof must show that the offense was committed at a time which precludes the bar.

9. SAME—STATEMENT OF FACTS—PRACTICE.—Appellant was convicted of manslaughter, under an indictment for murder. The statement of facts discloses no proof either of the venue or the time of the offense. Note the animadversions of this court upon this condition of the record, and especially its suggestion that, in authenticating a statement of facts, the trial judge, when the evidence warrants it, shall certify that the time of the commission of the offense, the venue of the offense, and the identity of the prisoner were fully proved.

APPEAL from the District Court of Cherokee. Tried below before the Hon. Peyton F. Edwards.

At the October term, 1883, of the District Court of Cherokee, the grand jury charged that B. F. Temple, the present appellant, did, on September 3, 1883, feloniously, and of his express malice aforethought, kill and murder William Clark. At the same term of the court the case came to trial, and appellant was found guilty of manslaughter. A term of four years in the penitentiary was the punishment assessed against him.

There was no controversy over the fact of the killing, nor over the fact that it was done by the appellant with the means alleged by the grand jury. A large number of witnesses testified in the case, both for the State and for the defense. The question principally contested was whether the defendant or the deceased fired the first shot in the conflict which resulted in the death of the latter. The evidence shows that the affray occurred at Jacksonville, a town on the Great Northern and International railroad, but fails to show in what county the town is situate or the homicide occurred. It shows that the deceased was marshal of the town, and that he was killed between sunset and dark, but does not show the date of the killing.

The State first introduced before the jury a diagram of the localities in the town of Jacksonville referred to in the testimony, and then offered in evidence a document purporting to be the deceased's dying declaration, as follows:

"DYING DECLARATION OF WM. A. CLARK.

"Man Temple was carrying a pistol. I saw it. I thought it was a pistol; been noticing it for about a week. Next news he was at a restaurant. I went down there and inquired for him. They said he was not there. Came back up in town, and a fellow

20

told me he was down there, and told me what room he was in. I went back and found him there with a pistol in his hand. I told him to give me the pistol. He said he would not do it. He got up then and came out and cocked his pistol on me, and walked backwards and told me not to advance on him. He went clear across the street, Temple did; and I went nearly across to the street. Temple went out on the lots, and I turned to go up in town, and he shot at me. The second shot he hit me. We shot out our pistols, and he went over home after his shot gun. After the second shot by him we shot out our pistols. He followed me up to town, with his shot gun, swearing that he was going to kill me. I never drew any pistol on him until we got out on the street and he had cocked his pistol on me. He fired two shots before I fired at all.

"W. A.   His ✕ Clark.
          mark.

" Attest:
    " B. B. Cannon.
    " John B. Reagan."

To the introduction of this declaration the defense interposed objections, based upon the mental condition of the deceased at the time it was made, and also because it related in part to matters which transpired before the commencement of the difficulty between the deceased and the defendant.

B. B. Cannon, one of the attesting witnesses to the declaration, testifying for the State, said he was present when it was made by the deceased. The deceased was rational, and said he had been informed by his physician that he would die. The impression on witness's mind was that the deceased thought he would die. No compulsion was used to get the deceased to make a statement. Witness signed the declaration as a witness, and identified it as the document exhibited. The witness was asked by the State's counsel whether the document was a correct statement of the deceased's declaration. The defense objected to the question, and the objection was overruled; but the record does not show the answer of the witness. On his cross-examination, the witness testified that the deceased made some statement about postponing the signing of the declaration, but witness did not know what it was. Deceased, however, did not say he would postpone it until morning.

John B. Reagan, the other subscribing witness, testifying for

the State, said he was present when the deceased signed the declaration, and signed it himself as a witness. Mr. Neely told deceased he was bound to die soon, and asked if he wanted to make any statement. Deceased said he did, and inquired for an officer several times. Witness told deceased he might live several hours, and perhaps until morning. Deceased's mind was perfectly clear. After he made the declaration he called his wife and his brother, Alg. Clark, and talked with them about his business, and about some arrangements with the latter relative to some property. He made the statement as Mr. Guinn reduced it to writing. He said he knew he could not get well. To Mr. Neely he said that he knew he would die. He made the declaration voluntarily and not in answer to interrogatories, and he died within thirty minutes after he made it. On the cross-examination this witness stated that the deceased was nervous at the time he was informed that his physician said he would die. Previous to that information the deceased said nothing about making a statement, but afterwards he was very anxious about it. He said nothing about postponing the signing of the statement.

On the foregoing proof as the predicate, the State proposed to read the document to the jury. The defense still objected, and introduced witnesses in rebuttal of the proof relied on by the prosecution. T. Andrews testified that the deceased, about half an hour before he died, spoke of signing a declaration, or statement, but said he could put it off until to-morrow, or words to that effect. There were several persons in the room at the time, but they were unknown to witness, except Cannon and Neely. On his cross-examination, the witness said he was not certain whether it was the deceased or some one else who spoke about postponing the matter until the next day.

Reverend J. J. Joplin, testifying for the defense, upon the same issue, stated that he did not hear the deceased say anything about postponing the statement, except that he was nervous. Deceased felt hopeful until witness told him he would die. In reply to questions asked him by witness, he said he would like to have witness read the Bible and pray for him. Witness did so. Witness was with deceased nearly all day, and when he died, at twenty-five minutes after five o'clock. It was between three and four o'clock when the witness told the deceased he must die. Deceased admitted he must die in a few hours, and said he was sinking. He made the declaration voluntarily,

and was perfectly rational at the time he made it. He died within twenty or thirty minutes after making it.

No further proof on the question being offered, the State again proposed to read the document in evidence as the dying declaration of the deceased. The defense still objected to the statement in its entirety, and specially objected to so much of it as related to matters which transpired previous to the difficulty between the deceased and the defendant. The court overruled the general objection, but sustained the special one, and drew a line across the document so as to designate the excluded portion. The record, however, does not show exactly at what point the line was drawn. Exception to the ruling of the court was reserved by the defense.

Proceeding with its evidence, the State, over objection by the defense, proved by the mayor of the town and other witnesses that the deceased was the town marshal, was generally known as such, and habitually wore the badge of his office on the lapel of his coat.

As to the circumstances immediately connected with the homicide, both the State and the defense introduced numerous witnesses, and their testimony abounds in circumstantial discrepancies, largely attributable, no doubt, to the difference in their opportunities for observation. The question principally contested was whether the defendant or the deceased precipitated the conflict and fired the first shot, and upon this question there was irreconcilable conflict between the testimony for the State and that for the defense. It appears that the defendant was in a room at a restaurant and boarding house, and that the deceased sought him there for the purpose of enforcing the town ordinances against the carrying of deadly weapons. It further appears that the defendant there refused to surrender his pistol to the deceased, and left the restaurant, the deceased following him.

J. C. Jarrett, for the State, testified that he heard loud talking, and saw the defendant and the deceased, who were from twenty-five to forty steps apart. Defendant had something in his hand which the witness thought was a pistol, and the deceased was following the defendant, who told the deceased he would kill him if he followed him. The deceased turned slightly to the right, as if to go up the street, and the defendant fired at him as he turned again and faced the defendant, who was daring the deceased to follow him. A second and third shots were fired

very close together, while both parties continued to move as they had been moving. Witness saw nothing to indicate that the deceased was wounded until the latter met him and handed him his pistol. Defendant was then near his father's gate, and was cursing and swearing that he would kill the deceased.

On cross-examination, the witness thought the deceased had on no coat or vest when the shooting occurred. Witness did not see the deceased's badge on him that evening.

W. S. Coker, for the State, testified that he saw the defendant with the deceased following him, and heard talking which he did not understand. Then he heard the defendant say, "Just follow me on," and repeat this expression. Deceased had his pistol swinging in his hand, and was saying something which the witness did not understand. Then the defendant said "I will kill you before to-morrow morning," and the deceased said something like "All right; by G—d, I've seen your sort before." Deceased then turned slightly to the right, and defendant cursed him and dared him to follow him. Then the deceased turned again and made two or three steps toward the defendant. The first shot was fired by the defendant, and his second shot and the deceased's first shot were close together. They kept moving on in the direction they had been going. About the third shot fired by defendant the deceased staggered and put his hand to his side, and his pistol was discharged toward the ground. Then the deceased fired his last shot. After the shooting the defendant went to his father's and got a shot gun, and, as he came back near witness, he cursed in a boisterous manner, like an angry man. He swore he would kill the deceased if the latter ever molested him again. This witness stated that the deceased had on a brown sack coat, and had his pistol in his hand before the defendant fired upon him; but did not then have his pistol in a shooting position, but was carrying it with his elbow slightly bent and his hand raised a little. Witness could not say whether deceased had on any badge of his office. The cross-examination of the witness elicited nothing material.

T. R. Heidleburg testified that the defendant had a pistol in his hand when he came out of the house, about five feet in advance of the deceased. Witness did not then see any pistol in the hands or possession of the deceased. The deceased said "I want that pistol," and the defendant replied "I've got the pistol, and you can't get it." After going on some distance the deceased pulled his pistol out of his pocket and said: "Temple,

stop and give me that pistol; it is my duty as an officer to arrest you and take it." As the deceased took a step or two to the right, as though he was going up town, the defendant began to dare him to follow him. Deceased turned after the defendant, and the latter fired twice before the deceased fired at all. Witness thought it was defendant's third shot that struck the deceased, who placed his left hand back and said "I am shot—I feel the ball in my kidneys." When the first shot was fired the deceased was carrying his pistol with his hand swinging down. Defendant repeatedly said to the deceased, "If you follow me I'll hurt you."

The State proved that the deceased was struck about an inch to the right of the navel, and about a half or three-quarters of an inch above it. The attendant physician was of opinion that the bullet may have lodged near the kidneys. Deceased died from the wound within forty-eight hours after he received it. The foregoing evidence sufficiently discloses the case made by the State upon its testimony in chief.

Mrs. Lizzie Lee was the first witness for the defense. She testified that the deceased came into the sitting room of the restaurant and asked her where her sisters Lula and Susan were. She told him they were in the partition room, and then he jumped out of a window and went to a window in the partition room, in which were the witness's two sisters and the defendant. The deceased came back through the window into the sitting room, and from there followed the defendant through the dining room into the street. All that the witness heard said was, that the defendant told the deceased not to follow him—that he did not want to hurt him.

Mrs. Lula Kidd, presumably a sister of the preceding witness, testified, for the defense, that she kept a restaurant in Jacksonville, and that the defendant came and asked her if he could get board and lodging, and at what price. Witness thought this occurred on the day of the homicide. Being told by her that he could get board and lodging at four dollars per week, he brought some of his clothes the same day, and was assigned the room in which he was found by the deceased. The deceased came to the window of the room, looked in and said "hello," and the defendant replied "hello." There was a pistol either in the defendant's hand or on the bed in front of the window. Deceased said, "Young man, I'll take that," and grabbed at the pistol. Defendant backed toward the door, with his face turned

toward the deceased, and said "You will not get it." The deceased then returned into the sitting room through the window, and followed the defendant, who, while passing through the hall of the house, told the deceased not to follow him; that he did not want to hurt him. Deceased followed the defendant out into the street, and the witness saw no more of the difficulty. Defendant had brought some of his clothes to the room in which the deceased found him. When the deceased demanded the pistol he grabbed at it, and jumped right into the room through the window, and the defendant went out into the hall. For two weeks previous to the difficulty nobody but transient boarders occupied or slept in the room in which the defendant was when the deceased came upon him.

B. S. Rogers, for the defense, testified that when he first saw the parties, the deceased was following the defendant, and the latter said, "Don't follow me; I don't want any difficulty with you. I will not give up my pistol." Deceased said, "If you don't give up the pistol, G—d d—n you, I will kill you." After defendant had crossed the street he told the deceased he would kill him if he followed him home, and the deceased immediately raised his hand and fired at the defendant. That was the first shot fired by either party. Defendant told the deceased, while in the street, that he would not give up his pistol, and that he had done nothing to be arrested for. This witness did not see the deceased make any turn, or in any way vary from a direct pursuit of the defendant. Witness did not remember telling H. L. Morris that he did not know who was engaged in the fuss, and had run away from it to keep from knowing anything about it.

On the cross-examination the State's counsel was allowed, over objection by the defense, to ask the witness if he did not, in June, 1882, tell Pat Rankin he was worth seven thousand dollars, and would give him half of it if he would kill Bud Smith; and also if he, the witness, did not, seventeen years ago, leave Shreveport because he was accused of murder. Being advised of his right to decline answering such questions, the witness availed himself of it.

George P. Watson, for the defense, testified that he saw the parties in the street, and heard the deceased say "Give me that pistol, G—d d—n you, or I will kill you." Defendant told the deceased he wanted no difficulty with him, had done nothing to

be arrested for, and would not give up the pistol. Witness could not tell which of them fired the first shot.

Robert Elliott, for the defense, testified that he heard a shot and instantly turned his head and saw the deceased, and about the deceased he saw smoke as if from a pistol. And the deceased fired another shot before the defendant fired. Before the second shot was fired, witness saw dust fly up near the defendant as if the bullet had struck the ground.

Other witnesses for the defense testified to much the same effect as those already mentioned.

The State, in rebuttal, introduced Mrs. Lizzie Lee, who stated that the room in which the defendant was found by the deceased was the bed room of herself, the witness. She had occupied it the previous night, and it had been continuously occupied by her ever since it had been assigned to her in the preceding spring. It had been occupied by no one besides herself, her child and her little sister during that time. She had not been told that it had been assigned to the defendant.

C. G. Boles, for the State, in rebuttal, testified that he saw the parties, and that the first shot was fired by the defendant at the deceased, who returned fire as quick as he could raise his hand. Defendant kept retreating and deceased pursuing him while the shooting continued, until both emptied their pistols, as the witness thought from the number of shots fired.

M. D. Morris, for the State, heard two shots fire from the direction in which the defendant had gone, and then saw the deceased fire. Witness was a brother-in-law of the deceased.

H. L. Morris, for the State, testified that he heard shooting and started toward it. On his way he met the defendant's witness, Rogers, and asked him if he knew what was the matter. Rogers replied that he did not know; that there was a big fuss around there, and he did not know who it was, and was leaving to keep from being a witness.

The foregoing presents enough of the testimony on both sides to answer the purposes of this report.

The defense moved for a new trial, and also in arrest of judgment. Both motions were overruled, and the defendant appealed.

*Frank Templeton*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. No venue having been proven, so far as shown by the record before us, we will be compelled to reverse the judgment of the lower court. In view of another trial, it may not be amiss to notice certain other questions raised and which are likely to arise again.

1. A sufficient predicate was laid for the introduction of the deceased's dying declarations, under the statute. (Code Crim. Proc.. Art. 748.) The declarations had been reduced to writing, and when the writing was offered in evidence all that portion of the declaration not relating immediately to the fact of the homicide and its attendant circumstances was, on special exception by defendant, properly excluded as evidence. "Dying declarations are admitted from the necessity of the case to identify the prisoner and the deceased; to establish the circumstances of the *res gestæ*, and to show the transactions from which the death results. When they relate to former and distinct transactions, they do not come within the principle of necessity." (Whart. Crim. Evid., 8 ed., sec. 278.)

2. It was objected that parol evidence was admitted to prove that the town of Jacksonville was an incorporated town, and that the deceased was, at the time he was killed, the marshal of said town. In some of the States, Alabama for instance, the rule is that "courts will judicially notice the charter or incorporating act of a municipal corporation, without being specially pleaded, not only when it is declared to be a public statute, but when it is public and general in its nature or purposes, though there be no express provision to that effect." (1 Dillon on Municipal Corp., 3 ed., sec. 83.) Such is not the rule in this State. With us a district judge is not charged with notice or judicial knowledge that any designated locality is an incorporated town or city. (*Patterson* v. *The State*, 12 Texas Ct. App., 222.)

And the reason for the rule as it obtains with us may be found in provisions of our law with regard to municipal corporations and the mode and manner of their creation. No special legislative act is required to create or legalize such corporations. Any town of two hundred inhabitants or any city may of itself become incorporated by complying with the general laws upon the subject. (Rev. Stats., Arts. 340 to 541 inclusive; Acts 17 Legislature, pp. 63, 115, 116, 117.) After an election has been held under the general laws, and "corporation" is carried, all that is necessary to invest the town with all the rights incident to corporations under the law is that the county judge "shall, within

twenty days after the receipt of the returns, make an entry upon the records of the Commissioners' Court that the inhabitants of the town are incorporated," etc. (Rev. Stats., Arts. 511 to 514.) It could scarcely be expected that the courts should judicially know of all such and when they have been made and placed on the records of the County Commissioners' Court.

Such acts of incorporation, it would seem, should be proven *aliunde.* How proven? We believe the correct rule is prescribed by Mr. Dillon. He says: "The primary evidence of a special charter or act of incorporation in this country is the original or an authenticated copy, or a printed copy published by authority. But if primary evidence cannot be had, *parol or secondary* evidence of its existence is admissible. Thus, where a public corporation had existed for a long space of time (in the instance before the court for forty years) the court admitted proof of its incorporation by *reputation,* the original act not being found, and it being probable that it had been destroyed by fire. So, evidence that a town has for many years exercised corporate privileges, no charter. after search, being found, is competent to go to the jury to establish that it was duly incorporated. And where there is no direct record evidence that a place has been incorporated, and it is sought to show the fact of incorporation from circumstantial evidence, the question is ordinarily for the jury and not the court; that is, the jury under the circumstances determine whether there is or is not sufficient ground to presume a charter or act of incorporation, or the due establishment and existence of a corporate district under some general act." (1 Dillon, 3 ed., sec. 84.)

If the incorporation be by legislative act, then under the rule the charter would be primary evidence, before the secondary could be resorted to. If the corporation be created under our general law above referred to, the best evidence would, perhaps, be a certified copy of the entry made by the county judge on the records of the Commissioners' Court (Rev. Stats., Art. 2252); and, failing to find or be able to produce that, then secondary evidence in accordance with the above rule may well be resorted to.

3. Deceased Clark's official character could be shown by proof of the fact that he was *de facto* marshal, and recognized as such by the proper municipal authorities, without the necessity of showing his appointment and qualification as such officer.

4. In addition to the fact that no venue is shown to have been proven, another omission is apparent in this voluminous state-

ment of facts, and that is that *the time or date of this homicide* is not made to appear by the evidence of a single witness who testified. It does occur to us that the proof should have shown at least that the homicide was committed prior to the filing of the indictment; and to support a conviction for manslaughter it should further show that that offense was not barred at the time of the presentment of the indictment. (*White* v. *The State,* 4 Texas Ct. App., 488.) An allegation in the indictment of a time within the statute is no evidence that is binding either upon the State or defendant; either may prove any other date prior to indictment, and in cases of less grade than murder the State must establish a time or date at which the prosecution would not be barred. We would here take occasion to suggest that it would be a good practice, and save all such questions, for the judge, in certifying the statement of facts, to certify, in every instance where the facts warrant it, that the time of the commission of the offense, the venue, and the identity of the prisoner were fully proven.

The charge of the court is complained of, and it is also urged that the court erred in refusing the specially requested instructions asked in behalf of defendant.

So far as the general charge of the court is concerned, it presents the law fully and explicitly as applicable to the facts. So far as the special instructions are concerned, the general charge embraced those that were proper to be given, and there was no error in refusing to give them.

For the errors above pointed out, the judgement is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered December 14, 1883.